1  Michael W. Sobol (State Bar No. 194857)
   Roger N. Heller (State Bar No. 215348)
2  Sarah R. London (State Bar No. 267083)
   Avery S. Halfon (pro hac vice forthcoming)
3  LIEFF CABRASER HEIMANN & BERNSTEIN LLP
   275 Battery Street, 29th Floor
4  San Francisco, CA 94111
   Telephone: (415) 956-1000
5
   Daniel M. Hattis (State Bar No. 232141)
6  Paul Karl Lukacs (State Bar No. 197007)
   HATTIS & LUKACS
7  400 108th Ave NE, Ste. 500
   Bellevue, WA 98004
8  Telephone: (425) 233-8650

9
   *Attorneys for Plaintiffs and the Proposed Class*
10

11                        UNITED STATES DISTRICT COURT

12                       NORTHERN DISTRICT OF CALIFORNIA

13

14
   IAN VIANU and IRINA BUKCHIN, on
15 behalf of themselves and all others          Case No. 3:19-cv-3602
   similarly situated,
16
                     Plaintiffs               **CLASS ACTION**
17
   v.                                         **ORIGINAL COMPLAINT FOR:**
18                                            **(1) VIOLATION OF CAL. BUSINESS &**
   AT&T MOBILITY LLC,                         **PROFESSIONS CODE § 17200;**
19                                            **(2) VIOLATION OF CAL. BUSINESS &**
                     Defendant.               **PROFESSIONS CODE § 17500;**
20                                            **(3) VIOLATION OF CAL. CIVIL CODE**
                                              **§ 1750;**
21                                            **(4) PERMANENT PUBLIC INJUNCTIVE**
                                              **RELIEF;**
22                                            **(5) BREACH OF THE IMPLIED**
                                              **COVENANT OF GOOD FAITH AND FAIR**
23                                            **DEALING**

24
                                              **JURY TRIAL DEMANDED**
25

26

27

28

1727288.9                                     CLASS ACTION COMPLAINT
                                              CASE NO. 3:19-CV-3602

1    Plaintiffs Ian Vianu and Irina Bukchin (collectively, "Plaintiffs") bring each cause of

2    action in this Complaint in their individual capacities and/or on behalf of a class of similarly

3    situated consumers, as set forth below, against Defendant AT&T Mobility LLC ("AT&T") and

4    respectfully allege as follows:

5    **INTRODUCTION**

6    1.    This case challenges a bait-and-switch scheme perpetrated by AT&T against its

7    wireless service customers.  AT&T prominently advertises particular flat monthly rates for its

8    post-paid wireless service plans.  Then, after customers sign up, AT&T actually charges higher

9    monthly rates than the customers were promised and agreed to pay.  AT&T covertly increases the

10   actual price by padding all post-paid wireless customers' bills each month with a bogus so-called

11   "Administrative Fee" (currently $1.99 every month for each phone line) on top of the advertised

12   price.  The Administrative Fee is not disclosed to customers before or when they sign up, and in

13   fact it is never adequately and honestly disclosed to them.  The so-called Administrative Fee is

14   not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T to charge more

15   per month for the service itself without having to advertise the higher prices.

16   2.    Through this scheme, AT&T has unfairly and improperly extracted hundreds of

17   millions of dollars in ill-gotten gains from California consumers.

18   3.    The first time AT&T even mentions the existence of the Administrative Fee is on

19   customers' monthly billing statements, which they begin receiving only after they sign up for the

20   service and are financially committed to their purchase.

21   4.    Making matters worse, AT&T deliberately hides the Administrative Fee in its

22   billing statements.  In AT&T's printed monthly billing statements, AT&T intentionally buries the

23   Administrative Fee in a portion of the statement that: (a) makes it likely customers will not notice

24   it; and (b) misleadingly suggests that the Administrative Fee is akin to a tax or another standard

25   government pass-through fee, when in fact it is simply a way for AT&T to advertise and promise

26   lower rates than it actually charges.  Thus, by AT&T's own design, the printed monthly

27   statements serve to further AT&T's scheme and keep customers from realizing they are being

28   overcharged.  Moreover, in AT&T's online billing statements that Plaintiffs and numerous other

AT&T wireless customers receive in lieu of printed statements (AT&T encourages customers to sign up for online billing), the default view for the billing statements does not even include any line item at all for the Administrative Fee that AT&T systematically charges to all of its post-paid customers.

5.      Deep within AT&T's website—where by design it is unlikely to be viewed by consumers, and certainly not before they purchase their wireless service plans—there is currently a purported description of the Administrative Fee.  Not only does this description fail to constitute an adequate disclosure of the Administrative Fee, it serves to further AT&T's deception and scheme by suggesting that the Administrative Fee is tied to certain costs associated with AT&T providing wireless telephone services (interconnect charges and cell site rental charges). Assuming this description were accurate, it would merely reinforce that this undisclosed fee should be included in the advertised monthly price for the service because those are basic costs of providing wireless service itself, and thus a reasonable consumer would expect those costs to be included in the advertised price for the service.  Moreover, on information and belief, the fee is not, in fact, tied to the costs that AT&T's buried description suggests.  This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated costs that the Administrative Fee is purportedly paying for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's financial statements.

6.      In all events, AT&T should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices for its post-paid wireless service plans in its price representations and advertising.  AT&T has failed to do so, and continues to fail to do so.

7.      AT&T first began sneaking the Administrative Fee into all of its post-paid wireless service customers' bills in 2013, initially at a rate of $0.61 per month per line.  For customers who had signed up prior to that time, and who reasonably expected to pay the monthly rates that AT&T advertised, AT&T made no disclosure to them that this additional charge could or would be added to drive up the true monthly price. The first these customers could have possibly learned about the existence of the Administrative Fee was if they noticed it on a monthly statement when

the fee was introduced, which they would have received months or even years after they signed up with AT&T.  For customers who signed up after the Administrative Fee was first introduced in 2013, AT&T likewise made no disclosure to them in its advertising or during the sign-up process of the existence of the Administrative Fee or that the true monthly price of the service plans would actually be higher than advertised and represented because of this bogus fee.

8.      Since the Administrative Fee was first introduced in 2013, AT&T has increased the amount of the fee three times, including twice over a three-month period in 2018.  The current amount that AT&T charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee.  In the past six years, AT&T has used this Administrative Fee scheme to improperly squeeze California consumers for hundreds of millions of dollars in additional charges.

9.      In essence, AT&T introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a lever by which AT&T continues to ratchet up the price without the customer realizing and after the customer is already committed.  This scheme has enabled, and continues to enable, AT&T to effectively increase its rates without having to publicly announce those higher rates, and allows AT&T to entice more customers by misrepresenting the costs customers would pay both in absolute terms and relative to other wireless providers in the industry.

10.     Plaintiffs, by this action, seek a public injunction to enjoin AT&T from its false advertising practice and to require AT&T to disclose to the consuming public, in advance, the true costs consumers will pay for its wireless services.

11.     Plaintiffs further seek, on behalf of themselves and a class of all similarly situated California consumers, an award of damages, restitution, pre- and post-judgment interest, attorneys' fees and costs, and permanent injunctive relief, including but not limited to that AT&T discontinue charging Plaintiffs and the putative class members the improper Administrative Fees.

**THE PARTIES**

12.     Plaintiff Ian Vianu is a citizen and resident of Alameda County, California.

13.     Plaintiff Irina Bukchin is a citizen and resident of Santa Clara County, California.

14.     Defendant AT&T Mobility LLC ("AT&T") is a Delaware limited liability company with its principal office or place of business at 1025 Lenox Park Boulevard NE, Atlanta, GA 30319.  AT&T transacts business in this district and throughout the United States.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy, exclusive of interest and costs, exceeds $5,000,000, and this is a proposed class action in which there are members of the proposed Class who are citizens of a state different from AT&T.

16.     This Court has personal jurisdiction over AT&T because, without limitation: (1) AT&T has purposely availed itself of the privileges of conducting business activities in California; (2) AT&T currently maintains systematic and continuous business contacts with California including marketing, selling, and issuing wireless services to Plaintiffs and other California consumers; (3) AT&T has entered into contracts with Plaintiffs and other California consumers to provide wireless services; and (4) AT&T maintains offices and retail locations throughout California.  AT&T has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible.

17.     Venue is proper pursuant to 28 U.S.C. §1391 because Plaintiffs reside in this District; many of the acts and transactions giving rise to this action occurred in this District; AT&T is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District through distribution and sale of its services in this District, does substantial business in this District, and is subject to personal jurisdiction in this District.

18.     Intra-District Assignment.  This action may properly be assigned to the San Francisco/Oakland Division, where Plaintiff Vianu resides, or the San Jose Division, where Plaintiff Bukchin resides.

## COMMON FACTUAL ALLEGATIONS

19.     AT&T falsely advertises its wireless services at lower monthly rates than it actually charges customers, by not disclosing and not including in the advertised price a bogus

"Administrative Fee" which AT&T imposes on all post-paid wireless service customers each month.

20. The so-called "Administrative Fee" is not, in fact, a bona fide administrative fee, but rather is simply a way for AT&T to charge more per month for the service itself without having to advertise the true, higher prices.

21. Since it first began imposing the Administrative Fee, AT&T has increased the dollar amount of the fee on three occasions, in essence using the fee as a lever to covertly, improperly, and unilaterally jack up the monthly rates for the services without having to publicly disclose to consumers the higher actual monthly prices. AT&T has deliberately rolled out the Administrative Fee and the increases thereto in a manner and timing that is designed by AT&T to further ensure that they go unnoticed by customers.

22. Through the scheme alleged herein, AT&T has, in effect, created a way to advertise and promise a lower monthly service price than it actually charges, and to secretly further increase its service price to existing customers at its whim, via this below-the-line hidden and deceptive Administrative Fee.

23. Revealingly, while it systematically imposes the Administrative Fee on all *post-paid* wireless customers, AT&T does *not* impose an Administrative Fee or any similar undisclosed charge on its *pre-paid* wireless service customers—i.e., the customers who pay month-to-month, in advance, for AT&T wireless services[1]—even though AT&T's purported service cost defrayment explanation for the Administrative Fee (charged to post-paid customers only) would seem to apply to both groups equally if at all. Presumably, this differential treatment is explained by the fact that AT&T does not see an opportunity to bait-and-switch pre-paid customers who know and pay the actual monthly charges before agreeing to receive the services.

## A. The Administrative Fee

24. The Administrative Fee is a uniform, per-phone line flat charge that AT&T adds to the bills of all AT&T post-paid wireless service customers across the country every month.

---

[1] A "pre-paid" plan is one where the customer pays up front for a month or other time period of service to be received. A "post-paid" plan, by contrast, is one where the customer signs up for a plan and is then billed each month during the plan for the services they received the prior month.

AT&T unilaterally sets the amount of the Administrative Fee at its sole discretion.  It is unrelated to any taxes or government assessments.

25.     AT&T first began imposing the Administrative Fee in approximately May 2013, at an initial rate of $0.61 per month per phone line.  The fee was added to the bills of all post-paid wireless customers, including customers like Plaintiffs who had signed up for the services well before the Administrative Fee even existed.

26.     Since the Administrative Fee was first imposed in 2013, AT&T has unilaterally increased the monthly amount of the fee three times.  AT&T increased the Administrative Fee to $0.76 per month per phone line starting in June 2016.  Then, in 2018, the increases became larger and more frequent (around the same time AT&T's parent company incurred significant debt in acquiring Time Warner Inc.).  AT&T raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing.  Thus, between March 2018 and June 2018 alone, AT&T increased the Administrative Fee from $0.76 to $1.99 per month per phone line, a whopping 162% increase in just three months.

**B.     AT&T Fails to Disclose the Administrative Fee to Customers.**

27.     At all relevant times, AT&T has aggressively advertised its post-paid wireless service plans through pervasive marketing directed at the consuming public in California and throughout the United States, including via high-profile television, radio, and online advertisements, and on its website and through materials at its numerous retail stores and the stores of third party businesses (e.g., Apple Stores, Best Buy) where customers can sign up for AT&T wireless services.

28.     In all of these locations and through all of these channels, AT&T consistently and prominently advertises particular flat monthly prices for its post-paid wireless service plans, without disclosing or including the Administrative Fee in the advertised price.  Neither the existence nor the amount of the Administrative Fee is disclosed or adequately disclosed to customers prior to or at the time they sign up for the services.

29.     By way of example only, AT&T ran two broad-scale national television

advertisements in 2016 that promoted the price for its post-paid wireless services as $180 per month for four lines.[2]  The flat monthly rate was prominently featured in the advertisements. There was no asterisk next to the advertised price or other qualifier disclosing the Administrative Fee.  At the tail end of the advertisements, there was some *very* tiny fine print that appeared on the bottom of the screen, five sentences long and so tiny as to render it unreadable by any reasonable consumer.  The fourth of these five tiny print sentences said that "Fees, monthly & other charges, add'l usage & other restr's apply."  There was no voice reading this tiny print, and viewers were not directed, even in the print itself, to anywhere they might learn what such fees are.

30.  As another example, in 2017, AT&T ran a broad-scale national television advertisement promoting its wireless service plans for under $40 per line per month, again with no asterisk (adjacent to the advertised price or anywhere else) or voice reading of the fine print.[3] The flat monthly rate was prominently featured in the advertisement.  The advertisement did not mention the Administrative Fee.  This ad, too, had very tiny print on the screen, appearing for just a few seconds and unreadable by a reasonable consumer.  One of several tiny print sentences (appearing for about three seconds) said that "Other charges, add'l usage & other rest's apply." Viewers were not directed to anywhere they might learn what such fees are.

31.  The unreadable, tiny print references in these advertisements to fees and other charges does not remotely constitute an adequate disclosure of the Administrative Fee by AT&T, particularly in light of the prominence routinely given to the supposed flat monthly service charges in AT&T's marketing.  Moreover, in any event, as alleged herein, the Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a way for AT&T to charge more for the service itself than is advertised.

32.  Likewise, at all relevant times, AT&T's proprietary website has advertised its post-paid wireless service plans, at all times prominently featuring the supposed flat monthly

---

[2] These 2016 ads can be viewed at https://www.ispot.tv/ad/AOz0/at-and-t-unlimited-plan-instant-crowd and https://www.ispot.tv/ad/At1d/at-and-t-unlimited-plan-data-rich-song-by-ti.
[3] This 2017 ad can be viewed here: https://www.ispot.tv/ad/Avvw/at-and-t-unbelievable-song-by-emf.

prices for the services, and not disclosing the Administrative Fee.  As of this filing, AT&T's website currently lists four post-paid wireless plan options prominently at the top, and a configurator which shows different prices for each plan depending on how many lines (between one and four) the consumer selects. For instance, if a consumer chooses a single line under the "AT&T Unlimited &More" plan, the price displayed is $70 per line, for a total of $70 per month. If the consumer instead chooses four lines under that same plan, the price displayed is $40 per line, for a total of $160 per month.[4]  Each of these options is presented as having a flat rate per month, with no asterisk or any other suggestion that the monthly cost for the service will actually be higher than the large bold flat monthly prices that are prominently presented.  Customers can click a link directly under those advertised prices to sign up for those services.  Neither the existence nor the amount of the Administrative Fee (which is in fact an additional $1.99 monthly charge for each line, e.g., $7.96 per month for four lines) is disclosed or adequately disclosed, though AT&T of course knows that it plans to charge the fee and in what amount.  For customers who sign up for AT&T wireless service plans via the AT&T website, there is no disclosure at all to them regarding the existence or the amount of the Administrative Fee, including on the final order submittal page.

33.     For those customers who contact an AT&T service representative about wireless service plans, either by phone or online, AT&T customer service personnel, as a matter of company policy, are trained to present the customer with the advertised flat monthly prices without disclosing the Administrative Fee.  If a potential customer calls AT&T's customer sales agents, or reaches out via web chat, and asks what if any other fees will be charged, the agents as a matter of company policy say that the only additions to the advertised prices (besides subscriptions to extra services or features) are taxes or other government-related fees passed on by AT&T to the customers.

34.     Similarly, if a consumer shops for a wireless service plan at an AT&T store, they are presented with the advertised supposed monthly service prices and nothing is disclosed to them about the Administrative Fee.  The AT&T stores use a uniform sales process in which a

---

[4] https://www.att.com/plans/wireless.html

sales representative walks customers through a proprietary sales application on an in-store iPad. For those customers who purchase their wireless service plans in-store, AT&T does not disclose the Administrative Fee anywhere in this in-store sign-up process.  In fact, AT&T does not disclose the total monthly price customers would pay after taxes, fees, and other charges at any time before the customer receives their first monthly statement (weeks after signing up).  There is no option to view the total monthly charges on the in-store iPad sales application, and sales agents are unaware of (or are trained to pretend to be unaware of) details beyond the fact that *taxes* will be charged on top of the advertised monthly prices.

35.     Customers may also sign up for AT&T wireless service plans at certain authorized third-party retail stores.  The customer experience in these stores is, in all material respects pertinent to this action, the same as in the AT&T stores.  Thus, if a consumer shops for an AT&T wireless service plan at a third-party retailer (e.g., Apple Store or Best Buy), they are presented with the advertised supposed monthly service prices and nothing is disclosed to the customer about the Administrative Fee.  At these stores, as at the AT&T stores, the customer purchase process is conducted through an iPad or other electronic display, the relevant content of which is determined by AT&T and does not include a disclosure of the Administrative Fee.  On information and belief, the pricing information and disclosures which are provided to customers in third-party stores are provided to the third-party retailers by AT&T.

36.     Because the Administrative Fee is flat, uniform nationwide, and set by AT&T, AT&T knows what the "fee" is at any given time before any prospective customer signs up, and AT&T could easily disclose the fee as part of its advertised prices.  However, as alleged herein, AT&T does not disclose the Administrative Fee or its amount to customers or potential customers.  There is no disclosure of the amount of the fee, and the only description of the Administrative Fee is buried deep in the fine print of its website—where AT&T knows customers are unlikely to visit and where they are not required to visit before signing up—and the description itself is false and misleading, as alleged further herein.

**C.      AT&T Continues to Deceive Customers After They Sign Up.**

37.     AT&T continues to deceive customers about the Administrative Fee and the true

1    monthly price of the services, even after they have signed up for the services.

2        38.    For customers, like Plaintiffs, who signed up with AT&T before the

3    Administrative Fee even existed, the first time they possibly could have learned about the fee's

4    existence was on their April 2013 billing statement one month prior to the fee being first imposed,

5    which would have been months or even years after the customer signed up.  For customers who

6    signed up after AT&T began imposing the fee, the billing statements are likewise the first

7    possible chance they might have had to learn about the fee, and by the time they received their

8    first statement they were already committed to their purchase.

9        39.    Moreover, far from constituting even a belated disclosure, the monthly billing

10   statements serve to further AT&T's scheme and deception.  AT&T's monthly statements (which,

11   again, customers only begin receiving after they have signed up and are committed): (a) bury the

12   Administrative Fee and the increases thereto so that they will continue to go unnoticed by

13   customers; and (b) for those customers who do manage to spot the fee on their statements, the

14   statements present the Administrative Fee in a location and manner that misleads the customer

15   regarding the nature of the fee.

16       40.    AT&T's printed statements prior to September 2018 included a section titled

17   "Monthly Charges," which listed a "Total Monthly Charges" amount for the wireless services and

18   a breakdown of those charges.  The Administrative Fee was *not* included as a line item in this

19   section, nor was the dollar amount of the Administrative Fee included in the "Total Monthly

20   Charges."  Instead, the Administrative Fee was relegated to a different section, further down in

21   the statement, titled "Surcharges and Other Fees."  Every other charge in that "Surcharges and

22   Other Fees" section is for government costs that AT&T must pay (e.g., taxes), except the

23   Administrative Fee.  This placement strongly suggests to customers who even notice the fee that

24   the Administrative Fee is akin to a tax or is another government-related pass-through charge,

25   which it is not.

26       41.    AT&T's printed statements since September 2018 similarly include a section

27   under each phone number titled "Monthly Charges," and a breakdown of those charges. Neither

28   the Administrative Fee nor its dollar amount is included as a line item in this section. Instead, the

1   Administrative Fee is relegated to a different section, further down in the statement, titled

2   "Surcharges & fees." Like in the "Surcharges and Other Fees" section in the bills prior to

3   September 2018, every other charge in the "Surcharges & fees" section is for government costs

4   AT&T must pay (e.g. taxes,), except the Administrative Fee. This again suggests to customers

5   who even notice the fee that the Administrative Fee is akin to a tax or is another government-

6   related pass-through charge, which it is not.

7          42.    Many, if not most, customers will not read the printed monthly statements

8   described above at all because AT&T encourages its customers to sign up for electronic billing

9   (in lieu of receiving paper statements).  Those who sign up for electronic billing (like Plaintiffs)

10  receive emails from AT&T directing them to an AT&T payment website.  On that payment

11  website, customers have the option to either click "Make a payment" or "See my bill."  If the

12  customer clicks "Make a payment," they would not see any disclosure at all of the Administrative

13  Fee or any notice of increases thereto.   If the customer clicks "See my bill," they are taken to a

14  screen showing, as a default, only the total amount due.  To review details of the bill, the

15  customer would have to click a "+" sign, and then once the text is expanded, the customer would

16  have to click a second nested "+" sign to expand even more text.  There, in a section separate

17  from and below the "Monthly plan charges" is another section labelled "Surcharges & fees,"

18  where the Administrative Fee is listed, similar to how it is misleadingly listed in the printed

19  statements.  No explanation of the Administrative Fee is provided there.

20         43.    If a customer happens to notice the Administrative Fee has been charged on their

21  monthly statement, and contacts AT&T via phone or online to inquire about the fee, AT&T

22  agents tell the customer that the Administrative Fee is like a tax or another pass-through

23  government charge.

24         44.    If customers realize that their actual total monthly bill is higher than promised

25  when they receive their monthly billing statements, they cannot simply back out of the deal

26  without penalty, even if they notice the fee and overcharge on their very first statement.[5]

27                a.     First, when customers sign up they pay a one-time activation fee (currently

28  [5] *See* https://www.att.com/shop/wireless/returnpolicy.html.

1    $30) that is refundable for only three days—well before they receive even their *first* monthly bill

2    (which they receive approximately two weeks after they sign up, either via an email notice

3    directing them to a payment website as described above, or via a mailed printed billing statement

4    if they have not signed up for electronic billing).

5              b.        Second, customers who signed up for a one-year or two-year service

6    commitment (the majority of customers until at least 2016) are charged an early termination fee

7    of up to $325 if they cancel their service more than 14 days after purchase (again, the customers

8    don't even receive notice of their *first* statement until around that same date or later).

9              c.        Third, many customers purchase devices (such as new cellular phones)

10   with their service plans; indeed, AT&T markets devices and wireless plans in bundles.  The

11   devices can only be returned to AT&T within the first 14 days after purchase. If customers return

12   a device within 14 days of purchase (again, typically still before receipt of the first monthly

13   billing statement), they pay a restocking fee of up to $45 or 10% of accessory prices over $200.

14   If they wait longer than 14 days, it is too late and they are on the hook for the full purchase price

15   of the device.

16             d.        Fourth, since 2016, AT&T has offered installment plans to pay for new

17   devices that are tied to customers' service plans.  Instead of a one-year or two-year service

18   commitment, many AT&T wireless customers today ostensibly have a month-to-month service

19   plan but sign 24-month or 30-month installment agreements with AT&T under which customers

20   pay for their cellular phone (i.e., the device) in monthly installments. For example, a customer

21   would pay, for an $800 phone, an equipment "installment" charge of $33.33 on each monthly

22   AT&T bill for 24 months.  If a customer cancels her service plan any time before the installment

23   plan is paid off, the full outstanding balance of her device becomes due immediately in a single

24   balloon payment.  For example, even if the customer notices the Administrative Fee on her very

25   first monthly statement (despite AT&T's efforts to hide it), and thereby immediately chooses to

26   cancel her service, AT&T will demand that the customer immediately pay the entire remaining

27   $800 balance all at once.  (If she returns the device within the 14-day return deadline, typically

28   prior to having received the first bill, she must still pay the restocking fee mentioned above.)  In

1   this way the installment plan balloon payment is similar to an early termination fee, creating a

2   large immediate cost to cancelling the AT&T service plan once customers learn their plans'

3   actual monthly prices are higher than advertised.

4         45.    The activation fee, restocking fee, early termination fee, and installment balloon

5   payment all function as ways to penalize and deter customers from cancelling after signing up,

6   and AT&T's policies (including the cancellation/return periods and how they relate to the timing

7   of the billing statements) are deliberately and knowingly designed by AT&T to lock customers in

8   if and when they deduce that they are being charged more per month than advertised.

9         46.    Because both the initial amount of the Administrative Fee charged in 2013 ($0.61)

10   and each of the three subsequent increases to the Administrative Fee have been by less than one

11   dollar each, AT&T knows that customers are unlikely to notice the increased charge on the total

12   price on their monthly bills.  Given that taxes and other government-related charges can already

13   vary by amounts smaller than one dollar from month to month, AT&T knows that customers

14   reasonably expect small changes in the total amount billed each month and will not be able to tell

15   that AT&T imposed or increased the Administrative Fee simply by comparing the total amount

16   billed that month to the total billed in the prior month or months.  For example, on information

17   and belief, AT&T intentionally split its 2018 increases of the Administrative Fee across a three-

18   month period (a $0.50 increase in April 2018, a one-month pause, and then another $0.73 increase

19   in June 2018) in order to make its planned total $1.23 fee increase harder for its customers to

20   detect.

21         47.    Each time AT&T has increased the Administrative Fee, AT&T has hidden the

22   increase by providing no disclosure or language whatsoever anywhere on the first billing

23   statement containing that increase.  Even a customer viewing the full long-form printed bill would

24   have zero notice that AT&T had increased the fee, or why their monthly total charge might be

25   higher than the prior month's total.

26         48.    The only place AT&T mentions to existing customers that it plans to increase the

27   Administrative Fee is on the printed monthly billing statement the month before the fee is actually

28   raised, and even then, each of the three times the fee was increased, AT&T buried that inadequate

1    "disclosure" among a mix of advertisements and notices unrelated to price increases.  For

2    example, before AT&T was set to increase the Administrative Fee to its current rate of $1.99 per

3    month in June 2018, AT&T buried an inadequate notice in its May 2018 printed billing

4    statements, in the third paragraph of a seldom-read section titled "News You Can Use."  The first

5    two paragraphs described how customers could "Get Customer Support Online" or "Build Your

6    Bundle. Find out about special offers."  Neither the title of this section nor the first two items

7    would alert customers that a *price increase* would be announced below (in the third item).

8    49.    Even if customers noticed that AT&T imposed or increased the Administrative

9    Fee, as discussed above, they would have to pay penalties at that point if they wanted to cancel

10   their AT&T service after learning of the fee or of a fee increase, as alleged herein.  AT&T has

11   drafted its contractual terms regarding cancellation fees and the like so that there are no

12   exceptions, meaning these cancellation fees and similar costs would apply no matter how high

13   AT&T chose to unilaterally increase the Administrative Fee.

14   50.    To wit, with respect to customers with a one-year or two-year service commitment

15   (which comprised the majority of customers until at least 2016), AT&T told an industry reporter,

16   after the fee was first imposed in 2013, that the Administrative Fee was "not a rate increase, and

17   customers won't be able to terminate their contract without penalty, that is, paying an early

18   termination fee."[6]  AT&T took this position even though its form Wireless Customer Agreement

19   stated that "if we increase the price of any of the services to which you subscribe . . . you may

20   terminate this agreement without paying an early termination fee . . . provided your notice of

21   termination is delivered to us within thirty (30) days" (capitalization omitted).

22   51.    Today, AT&T's Wireless Customer Agreement states that customers with service

23   commitments may cancel service without paying an early termination fee by notifying AT&T

24   within 30 days of a materially adverse change; but, the Wireless Customer Agreement *also* states

25   that changes to "surcharges" (which AT&T falsely and unfairly claims the Administrative Fee is)

26   are *not* materially adverse changes.  Based on that, AT&T does not allow customers with service

27   commitments to cancel service after an increase to the Administrative Fee (no matter the amount

28   [6] https://www.cnet.com/news/is-at-ts-admin-fee-just-a-sneaky-way-of-raising-rates/

1    of the increase) without paying an early termination fee of up to $325.

2         52.    As explained above, for customers with equipment installment plans, cancellation

3    after discovery of an increase in the Administrative Fee would likewise require an immediate

4    balloon payment of the entire equipment cost (often in the hundreds of dollars).

5         **D.    AT&T's Buried Description of the Administrative Fee is Inadequate and
                  Misleading.**

6

7         53.    The lone description that exists of the Administrative Fee that appears anywhere is

8    grossly inadequate and misleading.  Buried deep within AT&T's website—in a location AT&T

9    knows reasonable consumers are unlikely to venture, and where they are not required and are

10   highly unlikely to venture before signing up for the services—is a purported description of the

11   Administrative Fee.  This description does not remotely constitute an adequate disclosure to

12   customers or prospective customers of the Administrative Fee.  Moreover, this description was

13   not even available prior to the time the Administrative Fee was first imposed in 2013—including,

14   e.g., when Plaintiffs and many other customers signed up with AT&T.  Moreover, this buried

15   description is itself false and misleading in all events.

16        54.    The description in question states that the Administrative Fee helps defray a

17   portion of (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls

18   from AT&T customers to their customers, and (b) charges associated with cell site rents and

19   maintenance.  The description states that the Administrative Fee amount is subject to change "as

20   AT&T's costs change," further suggesting that the amount of the fee is tied to AT&T's costs for

21   interconnections and cell sites.

22        55.    A similar description was provided in the fine print at the bottom of AT&T's

23   printed billing statements through approximately July 2018.  There, AT&T likewise stated that

24   the Administrative Fee was "to help defray certain expenses AT&T incurs, such as

25   interconnection and cell site rents and maintenance."  Starting in July 2018, AT&T removed this

26   description from its billing statements.

27        56.    On information and belief, AT&T's description of the Administrative Fee is highly

28   misleading if not outright false.  AT&T's own public filings with the Securities & Exchange

1   Commission, during the time period since the Administrative Fee was first imposed, have

2   repeatedly stated that interconnection charges have been *decreasing* for years, even as AT&T has

3   *increased* the Administrative Fee *by more than 200%* during that same time frame.

4          57.     For example, in AT&T's 2015 Annual Report, under its Consumer Mobility

5   segment, AT&T reported a $2.4 billion decrease in operations and support expenses compared to

6   the year before. AT&T credited $434 million of the $2.4 billion decrease to reduced network

7   costs "primarily due to lower interconnect costs."

8          58.     AT&T's 2016 Annual Report again credited "lower network costs of $246

9   [million] driven by a decline in interconnect costs" as a primary contributor to the $1.8 billion

10   decrease in operations and support expenses.

11          59.     AT&T's 2017 Annual Report reported a $765 million decrease in overall "other

12   costs of services" expenses, credited in part to "lower traffic compensation and wireless

13   interconnect costs."

14          60.     AT&T's Annual Reports since 2015 have not mentioned cell site rental or

15   maintenance costs at all, implying that those are not a primary contributing factor to AT&T's

16   expenses. Meanwhile, on those same Annual Reports overall "operations and support expenses"

17   have continually declined over the years.

18          61.     Even if the Administrative Fee were truly tied to the costs of interconnection and

19   cell sites, customers would reasonably expect those costs to be *included* in the basic monthly rate

20   AT&T charges for wireless services.  After all, interconnectivity (connecting customers to

21   networks) and cell site rental and maintenance are basic parts of providing wireless services.

22   AT&T would not be able to provide functional or competitive wireless services without those

23   basic parts.  Thus, in all events, AT&T should be including the Administrative Fee as part of the

24   advertised monthly prices for its services, which as discussed herein it has never done and still

25   does not do.

26          62.     Contrary to AT&T's description, the Administrative Fee is *actually* used by

27   AT&T as a way to covertly jack up its monthly service prices, and thereby squeeze hundreds of

28   millions of additional dollars out of its customers, without having to advertise the true, higher

1    prices.

2         63.    As alleged above, the increases to the Administrative Fee are not, as AT&T's

3    buried description suggests, tied to changes in the costs of providing the services.  Rather, on

4    information and belief, AT&T has increased the fee, and thus has increased the monthly amounts

5    billed to consumers, in large part to fund unrelated corporate liabilities of its parent company

6    AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time

7    Warner Inc. in 2018.

8                        **PLAINTIFFS' FACTUAL ALLEGATIONS**

9    **Plaintiff Ian Vianu**

10        64.    Plaintiff Ian Vianu is, and at all relevant times has been, a California resident.

11        65.    Vianu first became an AT&T post-paid wireless customer on or around December

12   21, 2011.  He signed up for his first AT&T post-paid wireless service plan at an AT&T store in

13   the California Bay Area.  He signed up for a service contract with AT&T that was at least one-

14   year in length.  He also purchased an iPhone along with the service contract, as part of a bundle.

15        66.    When Vianu purchased his wireless service plan, AT&T prominently advertised,

16   to Vianu and to the public, that the plan would cost a particular monthly price.  AT&T did not

17   disclose to Vianu, at any time before or when he signed up, that AT&T would or might later add

18   an Administrative Fee on top of the advertised and promised monthly price.

19        67.    Vianu continued to have the same AT&T post-paid service plan until

20   approximately December 2014.

21        68.    AT&T first began charging Vianu an Administrative Fee in May 2013, at $0.61

22   per month.  Vianu did not receive notice or adequate notice that the Administrative Fee would be

23   charged or regarding the nature or basis of the fee.  AT&T has continued to charge Vianu an

24   Administrative Fee each month from May 2013 to the present.  During that time, AT&T has

25   increased the amount of the Administrative Fee charged to Vianu three times.  AT&T increased

26   the Administrative Fee to $0.76 in June 2016.  AT&T increased the Administrative Fee again to

27   $1.26 per month in April 2018.  AT&T increased the Administrative Fee again, just two months

28   later in June 2018, to $1.99 per month, which is the current fee amount as of this filing.

69.     Through its imposition of the Administrative Fees, AT&T has for several years charged Vianu a higher price for the services each month than AT&T advertised and that he promised and expected to pay.

70.     On or around December 21, 2014, Vianu changed his AT&T wireless service plan by visiting an AT&T store in San Francisco, California. During this visit, Vianu also purchased a new iPhone through AT&T on a 30-payment installment plan. Again, when Vianu made his purchase, AT&T prominently advertised, to Vianu and to the public, a particular monthly price for the service plan, and did not disclose the Administrative Fee. When Vianu switched his plan at the AT&T store, a salesperson walked him through a proprietary sales process on an iPad. During this process, AT&T represented to Vianu the supposed monthly price for the service, upon which Vianu reasonably relied. The price that AT&T stated did not include the Administrative Fee, nor did it reflect the true total amount he would be charged each month (inclusive of the Administrative Fee). Nor did AT&T disclose that the total price, inclusive of the Administrative Fee, would or might increase, including during the 30-payment period under Vianu's installment plan, as a result of increases to the Administrative Fee.

71.     Vianu made further changes to his AT&T service plan on or about January 11, 2015. Again, the Administrative Fee was never disclosed to him.

72.     On or around April 29, 2017, Vianu visited an AT&T store in Berkeley, California, and purchased a new iPhone on a 30-payment "AT&T Next" installment plan. When Vianu purchased the new iPhone, he did not change his existing wireless plan. Vianu continued, and continues to this day, to be enrolled in the same AT&T post-paid service plan he signed up for on or about January 11, 2015.

73.     At the time he purchased his original AT&T wireless post-paid service plan in 2011, Vianu signed up for AT&T electronic billing, as AT&T encouraged him to do. Vianu has been signed up for AT&T electronic billing at all times since then. Through that channel, Vianu has paid and continues to pay his monthly AT&T bill by clicking on a link in a monthly AT&T billing email, which in turn takes him to a website where he can pay his bill. As alleged above, like the printed monthly statements, AT&T's electronic billing process is deliberately designed in

1   a manner that keeps the Administrative Fee hidden from customers.  AT&T's monthly electronic

2   billing did not inform or adequately disclose to Vianu that AT&T was adding an Administrative

3   Fee to his bill each month.

4        74.     The first Vianu ever learned of the Administrative Fee's existence was in early

5   2018, when he examined a PDF version of his full printed statement to understand why his bill

6   had increased by some $15.00.  Prior to that time, he had no idea about the existence of the

7   Administrative Fee.  Based on the location of the Administrative Fee on the statement he

8   examined, Vianu believed when he read the statement that the Administrative Fee was a pass-

9   through government cost that AT&T was required to charge, like a tax.  At the bottom of the

10  billing statement, there was fine print misleadingly describing the Administrative Fee, as

11  described in more detail above.

12       75.     Since April 29, 2017, Vianu has been enrolled in an "AT&T Next" installment

13  plan for his cellular phone.  If Vianu were to cancel his AT&T wireless service before the

14  installment payments are complete, he would have to pay the full remaining balance immediately

15  in a single balloon payment.  For example, when AT&T raised the Administrative Fee to $1.99 in

16  June 2018, Vianu had an outstanding balance of $346.61 on his AT&T Next plan for his cellular

17  phone.  If Vianu did not wish to pay this newly increased Administrative Fee, he would have

18  needed to cancel his service, upon which AT&T would have immediately required him to make a

19  $346.61 balloon payment to AT&T.

20       76.     When Vianu agreed to purchase his AT&T service plans, he was relying on

21  AT&T's prominent representations, in each instance, regarding the monthly price of the services.

22  While he understood that taxes might be added to the price, he did not expect that AT&T would

23  charge a bogus so-called Administrative Fee on top of the advertised service price or that the true

24  price of the services would include an additional Administrative Fee which AT&T could and

25  would increase at its whim.  That information would have been material to him.  Had he known

26  that information he would not have been willing to pay as much for his plans and/or would have

27  acted differently.

28  **Plaintiff Irina Bukchin**

77.     Plaintiff Irina Bukchin is, and at all relevant times has been, a California resident.

78.     Bukchin has been an AT&T post-paid wireless services customer for at least 12 years, and previously was a post-paid wireless services customer of Cellular One and Cingular Wireless, which were taken over by and/or rebranded as AT&T.

79.     When Bukchin purchased each of her AT&T service plans, AT&T prominently advertised, to Bukchin and to the public, that the plans would cost a particular monthly price. AT&T did not disclose to Bukchin, at any time before or when she signed up, that AT&T would or might later add an Administrative Fee on top of the advertised and promised monthly price.

80.     In or around October 2010, Bukchin purchased an AT&T-subsidized iPhone at an Apple Store.  The iPhone was bundled with a two-year contract extension of her existing AT&T post-paid wireless service plan. When Bukchin made her purchase, AT&T prominently advertised, to Bukchin and to the public, a particular monthly price for the service plan.  AT&T did not disclose the Administrative Fee or the price inclusive of the Administrative Fee.  To sign up for the contract extension, Bukchin completed an AT&T-created contract extension process at the Apple Store.  As part of that process AT&T represented the monthly price that she would pay for the services, and Bukchin reasonably relied upon that representation.  The stated price did not include the Administrative Fee.  AT&T did not disclose to Bukchin, at any time before or when she signed up for this extension, that AT&T would or might later add an Administrative Fee on top of the advertised monthly price.

81.     AT&T first began charging Bukchin an Administrative Fee in May 2013, at $0.61 per month per line.  Bukchin did not receive notice or adequate notice that the Administrative Fee would be charged or regarding the nature and basis of the fee.  AT&T has continued to charge Bukchin an Administrative Fee each month from May 2013 to the present.  During that time, AT&T has increased the amount of the Administrative Fee charged to Bukchin three times.  AT&T increased the Administrative Fee to $0.76 in June 2016.  AT&T increased the Administrative Fee again to $1.26 per month in April 2018.  AT&T increased the Administrative Fee again, just two or three months later in July 2018, to $1.99 per month, which is the current fee amount as of this filing.

82.     Through its imposition of the Administrative Fees, AT&T has for several years charged Bukchin a higher price for the services each month than AT&T advertised and that she was promised and expected to pay.

83.     In or around September 2014, Ms. Bukchin purchased another AT&T-subsidized iPhone at an Apple Store. The iPhone was bundled with a two-year contract extension of her existing AT&T service plan.  Again, when Bukchin made her purchase, AT&T prominently advertised, to Bukchin and to the public, a particular monthly price for the service plan, and did not disclose the Administrative Fee.  To sign up for the contract extension, Bukchin completed an AT&T-created contract extension process.  As part of that process AT&T prominently represented the monthly price that she would pay for the services, and Bukchin reasonably relied upon that representation.  The stated price did not include the Administrative Fee.  AT&T did not disclose the Administrative Fee to Bukchin, at any time before or when she signed up for this extension.  Nor did AT&T disclose that the total price, inclusive of the Administrative Fee, would or might increase, including during the two-year contract period, as a result of increases to the Administrative Fee.

84.     In 2017 or 2018, Bukchin visited an AT&T store to add a second phone line to her existing AT&T wireless service plan. Bukchin did not purchase a new phone at this time, because the second line was for a relative who already possessed an existing phone compatible with AT&T service. When Bukchin updated her plan at the AT&T store to include the additional phone line, AT&T prominently advertised, to Bukchin and the public, a particular monthly price for the service plan, and did not disclose the Administrative Fee. When Bukchin updated her plan at the AT&T store, an AT&T salesperson walked her through a proprietary sales process on an iPad.  During this in-store process, AT&T represented to Bukchin the supposed updated monthly price for the service, and Bukchin reasonably relied upon that representation.  The price that AT&T stated did not include the Administrative Fee, nor did it reflect the true total amount she would be charged each month (inclusive of the Administrative Fee, which AT&T charged on *each* of her two lines).  Nor did AT&T disclose that the total price, inclusive of the Administrative Fee, would or might increase as a result of increases to the Administrative Fee.

85.     On or about May 23, 2018, Bukchin purchased another iPhone from a Best Buy store.  She did not make any changes to her existing AT&T wireless service plan at that time. Bukchin purchased the iPhone on an AT&T-provided 24-month installment plan, via an AT&T-created sign-up process.  During this sign-up process, AT&T did not disclose the Administrative Fee, nor did it disclose that the total price of her service plan may increase, including during the 24-month installment plan period, as a result of increases to the Administrative Fee.

86.     Bukchin signed up for AT&T electronic billing, as AT&T encouraged her to do. Bukchin has been signed up for AT&T electronic billing at all relevant times, and continues to be signed up for AT&T electronic billing.  Through that channel, Bukchin has paid and continues to pay her monthly AT&T bill by clicking on a link in a monthly AT&T billing email, which in turn takes her to a website where she can pay her bill.  As alleged above, like the printed monthly statements, AT&T's electronic billing process is designed in a manner that keeps the Administrative Fee hidden from customers.  AT&T's monthly electronic billing did not inform or adequately disclose to Bukchin that AT&T was adding an Administrative Fee to her bill each month.

87.     The first Bukchin ever learned of the Administrative Fee's existence was in September 2018.

88.     From approximately September 2014 through September 2016, Bukchin was enrolled in a two-year wireless services contract with AT&T, such that she would be charged a significant early termination fee (of up to $325) if she terminated her contract.

89.     Since May 23, 2018, Bukchin has been enrolled in an "AT&T Next" installment plan for her iPhone.  If Bukchin were to cancel her AT&T wireless service before the installment payments are complete, she would have to pay the full remaining balance immediately in a single balloon payment.  For example, when AT&T raised the Administrative Fee to $1.99 in July 2018, Bukchin had an outstanding balance of $595.81 on her AT&T Next plan for her cellular phone.  If Bukchin did not wish to pay this newly increased Administrative Fee, she would have had to cancel her service, upon which AT&T would have immediately required her to make a $595.81 balloon payment to AT&T.

90.     When Bukchin agreed to purchase her AT&T service plans, she was relying on AT&T's prominent representations, in each instance, regarding the monthly price of the services. While she understood that taxes might be added to the price, she did not expect that AT&T would charge a bogus Administrative Fee on top of the advertised service price or that the true price of the services would include an additional Administrative Fee.  That information would have been material to her.  Had she known that information she would not have been willing to pay as much for her plans and/or would have acted differently.

**CLASS ALLEGATIONS**

91.     As described herein, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

92.     Plaintiffs seek to represent the following Class:

> **All individual consumers in California who currently subscribe or formerly subscribed to a post-paid wireless service plan from AT&T Mobility LLC ("AT&T") and were charged what AT&T labeled an "Administrative Fee."**

93.     Excluded from the above Class are AT&T and any entities in which AT&T has a controlling interest, their officers, directors, employees, and agents, the judge to whom this case is assigned, members of the judge's staff, and the judge's immediate family.

94.     **Numerosity.**  The members of the Class are so numerous that joinder of all members would be impracticable.  While Plaintiffs do not know the exact number of Class members prior to discovery, upon information and belief, there are at least hundreds of thousands of Class members.

95.     **Commonality and Predominance**.  This action involves multiple common questions which are capable of generating class-wide answers that will drive the resolution of this case.  These common questions predominate over any questions affecting individual Class members, if any.  These common questions include, but are not limited to, the following:

a.      Whether AT&T should have disclosed the Administrative Fee and its dollar amount as part of the advertised price of its post-paid wireless services;

b.      Whether the Administrative Fee and the true price of AT&T's post-paid wireless services are material information, such that a reasonable consumer would find that

1    information important to their purchase decision;

2              c.        Whether a reasonable consumer is likely to be deceived by AT&T's

3    conduct and omissions alleged herein;

4              d.        Whether AT&T's description of the Administrative Fee is false and/or

5    misleading; and

6              e.        Whether AT&T has violated the covenant of good faith and fair dealing,

7    implied in its form contracts with its Plaintiffs and the Class, by imposing and increasing the

8    Administrative Fee in the manner alleged herein.

9          96.      **Typicality**.  Plaintiffs, like all Class Members, are current or former California

10   subscribers of post-paid AT&T wireless service plans who have been charged Administrative

11   Fees by AT&T.  Their claims all arise from the same course of conduct by AT&T and are based

12   on the same legal theories.  Plaintiffs' claims are typical of the Class members' claims.

13         97.      **Adequacy**.  Plaintiffs and their counsel will adequately protect the Class'

14   interests.  Plaintiffs have no interests antagonistic to Class members' interests and are committed

15   to representing the best interests of the Class.  Moreover, Plaintiffs have retained counsel who are

16   highly experienced in prosecuting complex class action and consumer protection cases.

17         98.      **Superiority.**  A class action is superior to all other available methods for fairly and

18   efficiently adjudicating this controversy.  Each Class member's interests are small compared to

19   the burden and expense required to litigate each of their claims individually, so it would be

20   impractical and would not make economic sense for Class members to seek individual redress for

21   AT&T's conduct.  Individual litigation would add administrative burden on the courts, increasing

22   the delay and expense to all parties and to the court system.  Individual litigation would also

23   create the potential for inconsistent or contradictory judgments regarding the same uniform

24   conduct.  A single adjudication would create economies of scale and comprehensive supervision

25   by a single judge.  Moreover, Plaintiffs do not anticipate any difficulties in managing a class

26   action trial.

27         99.      By its conduct and omissions alleged herein, AT&T has acted and refused to act

28   on grounds that apply generally to the Class, such that final injunctive relief and/or declaratory

1    relief is appropriate respecting the Class as a whole.

2        100.    The nature of AT&T's misconduct is non-obvious and/or obscured from public

3    view, and neither Plaintiffs nor the members of the Class could have, through the use of

4    reasonable diligence, learned of the accrual of their claims against AT&T at an earlier time. This

5    Court should, at the appropriate time, apply the discovery rule to extend any applicable

6    limitations period (and the corresponding class period) to the date on which AT&T first began

7    charging the Administrative Fee.

8                              **NULLITY OF ARBITRATION PROVISION**

9        101.    Plaintiffs and all proposed Class members are subject to AT&T's form "Wireless

10    Customer Agreement."  At all relevant times, this contract has included materially the same

11    arbitration provision that, according to its terms and as drafted by AT&T, is null and void in its

12    entirety here.

13        102.    Under California law, parties may not agree to waive the right to seek public

14    injunctive relief under California's Unfair Competition Law, False Advertising Law, and the

15    Consumer Legal Remedies Act in any forum, and any such agreements are contrary to California

16    public policy and are unenforceable.  *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017).

17        103.    AT&T's Wireless Customer Agreement, which governs the services at issue here

18    for Plaintiffs and all proposed Class members, includes an arbitration agreement as Section 2.2.

19    Section 2.2(6) of that arbitration agreement states that: "The arbitrator may award declaratory or

20    injunctive relief only in favor of the individual party seeking relief and only to the extent

21    necessary to provide relief warranted by that party's individual claim."  This language purports to

22    bar the arbitrator from granting the type of public injunctive relief authorized under California

23    law as a remedy for claims under California's Unfair Competition Law, False Advertising Law,

24    and the Consumer Legal Remedies Act.  As Section 2.2(1) purports to require the parties to

25    arbitrate "all disputes and claims," the arbitration provision thus purports to bar the parties from

26    seeking public injunctive relief in any forum.  Such a provision is unenforceable under *McGill*.

27        104.    Section 2.2(6) of AT&T's arbitration agreement concludes with a non-severability

28    (or "poison pill") provision, stating: "If this specific provision is found to be unenforceable, then

1   the entirety of this arbitration provision shall be null and void."

2   　　　105.　Because Section 2.2(6) is unenforceable under California law as an improper

3   waiver of public injunctive relief in any forum, the "entirety" of the full arbitration agreement

4   (Section 2.2) is "null and void."  Therefore, the claims brought in this lawsuit are not subject to

5   any of the requirements of AT&T's arbitration agreement.

6   　　　106.　Two courts in this District have already concluded that the very same AT&T

7   arbitration agreement is null and void for just these reasons.  *See Roberts v. AT&T Mobility LLC*,

8   No. 3:15-cv-3418-EMC, 2018 WL 1317346 (N.D. Cal. Mar. 14, 2018); *McArdle v. AT&T*

9   *Mobility LLC*, No. 09-cv-1117-CW, 2017 WL 4354998 (N.D. Cal. Oct. 2, 2017).

10   

**CAUSES OF ACTION**

11   **FIRST CAUSE OF ACTION:**
**Violation of California's Unfair Competition Law ("UCL")**

12   **California Business & Professions Code § 17200, *et seq.***

13   　　　107.　Plaintiffs reallege and incorporate by reference every allegation set forth in the

14   preceding paragraphs as though alleged in this cause of action.

15   　　　108.　California Business & Professions Code § 17200, *et seq.*, also known as

16   California's Unfair Competition Law (UCL), prohibits any unfair, unlawful, or fraudulent

17   business practice.

18   　　　109.　By its conduct and omissions alleged herein, AT&T's has violated the "unfair"

19   prong of the UCL, including without limitation by: (a) pervasively misrepresenting AT&T

20   wireless service plan prices while failing to disclose and/or to adequately disclose that AT&T

21   actually charges higher monthly prices than advertised, through its imposition of Administrative

22   Fees on top of the advertised price; (b) continuing to hide, obscure, and misrepresent the

23   Administrative Fees even after customers have signed up; (c) charging a so-called

24   "Administrative Fee" that is not in fact a bona fide administrative fee; (d) imposing and

25   increasing the Administrative Fee on customers without notice or adequate notice; (e) preventing

26   existing customers from canceling their services after learning the actual total monthly amount

27   they are charged or learning of the Administrative Fee or increases to the Administrative Fee; and

28   (f) imposing and increasing the Administrative Fee as a covert way to increase the actual monthly

1    prices customers pay for their services without having to advertise the actual higher prices and/or

2    in response to unrelated corporate costs incurred by its corporate parent.

3         110.   AT&T's conduct and omissions alleged herein are immoral, unethical, oppressive,

4    unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and the Class.

5    Perpetrating a years-long scheme of misleading and overcharging customers is immoral,

6    unethical, and unscrupulous.  Moreover, AT&T's conduct is oppressive and substantially

7    injurious to consumers. By its conduct alleged herein, AT&T has improperly extracted millions of

8    dollars from California consumers. There is no utility to AT&T's conduct, and even if there were

9    any utility, it would be significantly outweighed by the gravity of the harm to consumers caused

10   by AT&T's conduct alleged herein.

11        111.   AT&T's conduct and omissions alleged herein also violate California public

12   policy, including as such policy is reflected in Cal. Civ. Code § 1750 *et seq.* and Cal. Civ. Code

13   §§ 1709-1710.

14        112.    By its conduct and omissions alleged herein, AT&T has violated the "unlawful"

15   prong of the UCL, including by making material misrepresentations and omissions in violation of

16   Cal. Bus. & Prof. Code § 17500 *et seq.* and Cal. Civ. Code § 1750, *et seq.,* engaging in deceit in

17   violation of Cal Civ. Code §§ 1709-1710, and violating the implied covenant of good faith and

18   fair dealing, in violation of California common law.

19        113.   AT&T has violated the "fraudulent" prong of the UCL by making material

20   misrepresentations and omissions, including regarding: (a) the true prices of its post-paid wireless

21   service plans; (b) the existence and amount of Administrative Fees; and (c) the nature and basis of

22   the Administrative Fees.

23        114.   With respect to omissions, AT&T at all relevant times had a duty to disclose the

24   information in question because, *inter alia*: (a) AT&T had exclusive knowledge of material

25   information that was not known to Plaintiffs and the Class; (b) AT&T concealed material

26   information from Plaintiffs and the Class; and (c) AT&T made partial representations, including

27   regarding the supposed monthly prices of the services, which were false and misleading absent

28   the omitted information.

115.    AT&T's material misrepresentations and nondisclosures were likely to mislead reasonable consumers, existing and potential customers, and the public.

116.    AT&T's misrepresentations and nondisclosures deceive and have a tendency to deceive the general public and reasonable consumers.

117.    AT&T's misrepresentations and nondisclosures are material, such that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

118.    Plaintiffs and members of the proposed Class reasonably relied on AT&T's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, AT&T's wireless service plans had they known the truth.

119.    By its conduct and omissions alleged herein, AT&T received more money from Plaintiffs and the Class than it should have received, including the excess Administrative Fees that AT&T charged Plaintiffs and the Class on top of the advertised prices for the service plans, and that money is subject to restitution.

120.    As a direct and proximate result of AT&T's unfair, unlawful, and fraudulent conduct, Plaintiffs and the proposed Class members lost money.

121.    AT&T's conduct has caused substantial injury to Plaintiffs, proposed Class members, and the public.  AT&T's conduct is ongoing and is likely to continue and recur absent a permanent injunction.  Accordingly, Plaintiffs seek an order enjoining AT&T from committing such unlawful, unfair, and fraudulent business practices.  Plaintiffs further seek an order granting restitution to Plaintiffs and the Class in an amount to be proven at trial.   Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

122.    Absent injunctive relief, AT&T will continue to injure Plaintiffs and the Class members.  AT&T's misrepresentations and omissions regarding the true service plan prices and regarding the Administrative Fees are ongoing.  Moreover, AT&T continues to charge customers the unfair and unlawful Administrative Fees.  Even if such conduct were to cease, it is behavior that is capable of repetition or re-occurrence by AT&T, which is a dominant player in the industry and has many millions of customers in California alone.

123.     Plaintiffs individually seek public injunctive relief, under the UCL, to protect the general public from AT&T's false advertisements and omissions—including AT&T's advertising of monthly service rates that do not reflect the true rates, and AT&T's failure to disclose or adequately disclose the true rates or the Administrative Fees.

**SECOND CAUSE OF ACTION:**
**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code § 17500, *et seq.***

124.     Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this cause of action.

125.     By its conduct and omissions alleged herein, AT&T has committed acts of untrue and misleading advertising, as defined by and in violation of California Business & Professions Code § 17500, *et seq.*, also known as California's False Advertising Law (FAL).  These acts include but are not limited to: (a) misrepresenting the prices of its wireless service plans; (b) failing to disclose or adequately disclose the true prices of its wireless service plans and the existence, amount, or nature of Administrative Fees; (c) continuing to hide, obscure, and misrepresent the Administrative Fee even after customers sign up; and (d) describing the Administrative Fee, in its buried description, in a manner that is false and misleading.

126.     With respect to omissions, AT&T at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) AT&T had exclusive knowledge of material information that was not known to Plaintiffs and the Class; (b) AT&T concealed material information from Plaintiffs and the Class; and (c) AT&T made partial representations, including regarding the supposed monthly prices of the services, which were false and misleading absent the omitted information.

127.     AT&T's misrepresentations and nondisclosures deceive and have a tendency to deceive the general public.

128.     AT&T's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

129.     Plaintiffs and members of the proposed Class reasonably relied on AT&T's

1  material misrepresentations and nondisclosures, and would not have purchased, or would have

2  paid less money for, AT&T's service plans had they known the truth.

3      130.    By its conduct and omissions alleged herein, AT&T received more money from

4  Plaintiffs and the Class than it should have received, including the excess Administrative Fees

5  that AT&T charged Plaintiffs and the Class on top of the advertised prices for the service plans,

6  and that money is subject to restitution.

7      131.    As a direct and proximate result of AT&T's violations of the FAL, Plaintiffs and

8  the proposed Class members lost money.

9      132.    AT&T's conduct has caused substantial injury to Plaintiffs, proposed Class

10 members, and the public. AT&T's conduct is ongoing and is likely to continue and recur absent a

11 permanent injunction. Accordingly, Plaintiffs seek an order enjoining AT&T from committing

12 such violations of the FAL. Plaintiffs further seek an order granting restitution to Plaintiffs and

13 the Class in an amount to be proven at trial.  Plaintiffs further also seek an award of attorneys'

14 fees and costs under Cal. Code Civ. Proc. § 1021.5.

15     133.    Absent injunctive relief, AT&T will continue to injure Plaintiffs and the Class

16 members. AT&T's misrepresentations and omissions regarding the true service plan prices and

17 regarding the Administrative Fees are ongoing. Moreover, AT&T continues to charge customers

18 the unfair and unlawful Administrative Fees. Even if such conduct were to cease, it is behavior

19 that is capable of repetition or re-occurrence by AT&T, which is a dominant player in the industry

20 and has many millions of customers in California alone.

21     134.    Plaintiffs individually seek public injunctive relief, under the FAL, to protect the

22 general public from AT&T's false advertisements and omissions—including AT&T's advertising

23 of monthly service rates that do not reflect the true rates, and AT&T's failure to disclose or

24 adequately disclose the true rates or the Administrative Fees.

**THIRD CAUSE OF ACTION:**
**Violation of the Consumer Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***

27     135.    Plaintiffs reallege and incorporate by reference every allegation set forth in the

28 preceding paragraphs as though alleged in this cause of action.

1    136.    AT&T is a "person" within the meaning of Cal. Civ. Code § 1761(c).

2    137.    Plaintiffs and the proposed Class members are "consumers," as defined by Cal.

3    Civ. Code §1761(d).

4    138.    The wireless service plans that AT&T marketed and sold are "services," as defined

5    by Cal. Civ. Code §1761(a) and (b).

6    139.    The purchases of AT&T's wireless service plans by Plaintiffs and proposed Class

7    members are "transactions," as defined by Cal. Civ. Code § 1761(e).

8    140.    Plaintiffs and proposed Class members purchased AT&T's wireless service plans

9    for personal, family, and household purposes as meant by Cal. Civ. Code § 1761(d).

10    141.    Venue is proper under Cal. Civil Code § 1780(d) because a substantial portion of

11    the transactions at issue occurred in this county.  Plaintiffs' declarations establishing that this

12    Court is a proper venue for this action are attached hereto as **Exhibit A**.

13    142.    AT&T intentionally deceived Plaintiffs and proposed Class members, and

14    continues to deceive the public, by misrepresenting the prices of its services and by failing to

15    disclose or adequately disclose the Administrative Fee or the true prices of the services.  AT&T

16    has intentionally deceived Plaintiffs and the proposed Class members, and continues to deceive

17    the public, by misrepresenting and failing to disclose or adequately disclose material information

18    about the true prices of the services and about the existence, amount, and basis of the

19    Administrative Fee.

20    143.    AT&T's conduct alleged herein has violated the CLRA in multiple respects,

21    including, but not limited to, the following:

22        a.    AT&T advertised its wireless service plans with an intent not to sell them

23    as advertised (Cal. Civ. Code § 1770(a)(9));

24        b.    AT&T misrepresented that its wireless service plans were supplied in

25    accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

26        c.    AT&T inserted unconscionable provisions in its consumer agreements,

27    including an arbitration clause which waives the right to seek public injunctive relief in any

28    forum, in violation of California law.

144.    With respect to omissions, AT&T at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) AT&T had exclusive knowledge of material information that was not known to Plaintiffs and the Class; (b) AT&T concealed material information from Plaintiffs and the Class; and (c) AT&T made partial representations, including regarding the supposed monthly prices of the services, which were false and misleading absent the omitted information.

145.    AT&T's misrepresentations and nondisclosures deceive and have a tendency to deceive the general public.

146.    AT&T's misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

147.    Plaintiffs and members of the proposed Class reasonably relied on AT&T's material misrepresentations and nondisclosures, and would not have purchased, or would have paid less money for, AT&T's service plans had they known the truth.

148.    As a direct and proximate result of AT&T's violations of the CLRA, Plaintiffs and the proposed Class members have been damaged.

149.    AT&T's conduct alleged herein caused substantial injury to Plaintiffs, proposed Class members, and the public. AT&T's conduct is ongoing and is likely to continue and recur absent a permanent injunction.  Accordingly, Plaintiffs seek an order enjoining AT&T from committing such practices.  Plaintiffs also seek attorneys' fees and costs.

150.    Plaintiffs individually seek public injunctive relief, under the CLRA, to protect the general public from AT&T's false advertisements and omissions.

151.    In accordance with California Civil Code § 1782(a), on June 20, 2019, Plaintiffs' counsel served AT&T with notice of its CLRA violations by certified mail, return receipt requested.  A true and correct copy of that notice is attached hereto as **Exhibit B**.  If AT&T fails to provide appropriate relief for its CLRA violations within 30 days of Plaintiffs' notification letter, Plaintiffs will amend this complaint to seek compensatory and exemplary damages as permitted by Cal. Civ. Code §§ 1780 and 1782(b).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CAUSE OF ACTION:
### (Individually)

### Permanent Public Injunctive Relief
### Under California Civil Code § 3422 and All Inherent or Other Authority

152.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this cause of action.

153.    If not enjoined by this Court, AT&T will continue to injure the general public through its false advertising and omissions alleged herein, which are directed at the consuming public, including in California.

154.    In order to prevent injury to the general public, Plaintiffs individually seek public injunctive relief in the form of a judgment and injunction to permanently enjoin AT&T from its false advertising and to require AT&T to disclose to the public in advance the true prices consumers will pay if they sign up for AT&T's wireless services, or as the Court otherwise deems just and proper.

155.    The balance of the equities favors the entry of permanent public injunctive relief. The general public will continue to be harmed, and AT&T's unlawful behavior is likely to continue, absent the entry of permanent public injunctive relief.  Therefore, a public injunction is in the public interest.

## FIFTH CAUSE OF ACTION:
### Breach of the Implied Covenant of Good Faith and Fair Dealing

156.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this cause of action.

157.    Plaintiffs allege this cause of action in the alternative.

158.    To the extent AT&T's Wireless Customer Agreement could be read as granting AT&T discretion to impose and/or increase the Administrative Fee, which Plaintiffs do not concede, that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by California law.

159.    AT&T has violated the covenant of good faith and fair dealing by its conduct alleged herein.

160.    AT&T has abused any discretion it had under the contract to impose or increase the Administrative Fee.  On information and belief, AT&T imposed and increased the Administrative Fee that it charged, not, as AT&T misleadingly stated in its buried description, in response to cell site rental and maintenance costs or interconnectivity costs, which AT&T's financial statements show have gone down at the same time AT&T has significantly increased the amount of the fee.  Rather, AT&T imposed and has increased the Administrative Fee as a covert way to increase customers' monthly rates without having to advertise such higher rates.  On information and belief, AT&T increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

161.    AT&T's imposition and increasing of the Administrative Fees defied customers' reasonable expectations, was objectively unreasonable, frustrated the basic terms of the parties' agreement, and defied even AT&T's own buried description of the fee.  AT&T's conduct alleged herein was arbitrary and in bad faith.

162.    AT&T's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and Class members the full benefit of their bargains with AT&T.

163.    Plaintiffs and the Class members have performed all, or substantially all, of the obligations imposed on them under their contracts with AT&T.  There is no legitimate excuse or defense for AT&T's conduct.

164.    Any attempts by AT&T to defend its overcharging through reliance on contractual provisions will be without merit.  Any such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the hidden and deceptive nature of AT&T's misconduct, among other reasons. Any such provisions, if any, would not excuse AT&T's abuses of discretion or otherwise preclude Plaintiffs and the Class from recovering for breaches of the covenant of good faith and fair dealing.

165.    Plaintiffs and members of the Class sustained damages as a result of AT&T's

1   breaches of the covenant of good faith and fair dealing.  Plaintiffs seek damages in an amount to

2   be proven at trial.

3                                      **PRAYER FOR RELIEF**

4          166.    In order to prevent injury to the general public, Plaintiffs individually request that

5   the Court enter a public injunction, under the UCL, FAL, and CLRA, enjoining AT&T from

6   falsely advertising the prices of its wireless service plans and from concealing the true prices of

7   its wireless service plans;

8          167.    Further, on behalf of themselves and the proposed Class, Plaintiffs request that the

9   Court order relief and enter judgment against AT&T as follows:

10                 a.      Declare this action to be a proper class action, certify the proposed Class,

11  and appoint Plaintiffs and their counsel to represent the Class;

12                 b.      Permanently enjoin AT&T from engaging in the misconduct alleged

13  herein, and order AT&T to discontinue charging the Administrative Fees to its customers in

14  California;

15                 c.      Order AT&T to pay damages and restitution to Plaintiffs and the Class in

16  an amount to be proven at trial;

17                 d.      Order AT&T to pay court attorneys' fees, costs, and pre-judgment and

18  post-judgment interest;

19                 e.      Retain jurisdiction to monitor AT&T's compliance with the permanent

20  injunctive relief; and

21                 f.      Provide all other relief to which Plaintiffs and the Class may show

22  themselves justly entitled.

23

24

25

26

27

28

1

## JURY DEMAND

2        168.    Plaintiffs demand a trial by jury on all issues so triable.

3

Dated: June 20, 2019                     Respectfully submitted,

4
                                         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5

6
                                         By: _/s/ Michael W. Sobol_____
7
                                         LIEFF CABRASER HEIMANN & BERNSTEIN LLP
8                                        Michael W. Sobol (State Bar No. 194857)
                                         Roger N. Heller (State Bar No. 215348)
9                                        Sarah R. London (State Bar No. 267083)
                                         Avery S. Halfon*
10                                       275 Battery Street, 29th Floor
                                         San Francisco, CA 94111
11                                       (415) 956-1000
                                         (415) 956-1008 (fax)
12
                                         HATTIS & LUKACS
13                                       Daniel M. Hattis (State Bar No. 232141)
                                         Paul Karl Lukacs (State Bar No. 197007)
14                                       400 108th Ave NE, Ste. 500
                                         Bellevue, WA 98004
15                                       (425) 233-8650
                                         (425) 412-7171 (fax)
16
                                         *Attorneys for Plaintiffs and the Proposed Class*
17
                                         *Pro hac vice application to be submitted*
18

19

20

21

22

23

24

25

26

27

28